UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
**LEONARD ROUSSIN,**                                )
                                                    )
           **Plaintiff,**                           )
                                                    )        **Civil No.**
           **v.**                                   )        **13-12539-FDS**
                                                    )
**COVIDIEN LP,**                                    )
                                                    )
           **Defendant.**                           )
_____)

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is an action alleging unlawful employment discrimination on the basis of age.

Plaintiff Leonard Roussin was employed as a director in the federal tax compliance group at

defendant Covidien LP in Mansfield, Massachusetts.  He alleges that he was unlawfully

terminated from his position because of his age in violation of the Age Discrimination in

Employment Act, 29 U.S.C. § 623(a)(1) ("ADEA"), and Mass. Gen. Laws ch. 151B § 4.

Covidien has moved for summary judgment in its favor.  For the reasons described

below, the motion will be granted.

**I.       Factual Background**

The following facts are undisputed unless otherwise noted.

**A.       Roussin's Hiring and Job Duties**

Covidien is a large manufacturer of medical devices and supplies.  Leonard Roussin is a

certified public accountant.

Roussin was hired by Covidien as Director, Federal Tax Compliance in November 2007. (Pl.'s SOF ¶ 4).  Stephen Carey, Vice President of Tax, and Sean Healy, Director of U.S. International Tax Compliance, interviewed Roussin for the position and supported his hiring. (*Id.* ¶¶ 2, 3).  At the time Roussin was hired, he was 57 years old; Carey was 51; and Healy was 42.  (*Id.* ¶ 5).

Roussin's duties included reviewing and preparing federal tax returns, working on quarterly estimated payments, preparing federal tax return extensions, reviewing pre-acquisition tax returns, coordinating work on the research and development tax credit and the Section 199 tax deduction, and providing the Tax Accounting group with tax differences on a quarterly basis. (Roussin Dep. at 27-28, 37).[1]  Roussin was responsible for ensuring that all requirements of such projects were satisfied and for reviewing the work of senior managers and managers on tax returns, estimates, and tax extensions.  (*Id.* at 55).  Once Roussin reviewed the work, the work product went to Healy for a second review.  (*Id.*).

One of Roussin's duties was to help ensure the accurate preparation and filing of all federal income tax returns, estimates, and extensions.  (Healy Aff. ¶ 7).  The Federal Tax Compliance group was required to meet various internal deadlines to ensure that tax documents were ultimately accurately and timely filed with the tax authorities.  (*Id.*).

Roussin's first supervisor at Covidien was Greg Schmeichel, who held the position of Senior Director, Federal Tax Compliance.  (*Id.* ¶ 4).  Schmeichel reported directly to Carey. (*Id.*).  Other members of the Federal Tax Compliance group included Senior Managers Nancy Medeiros and Debbie McNamara and Manager Ericke Schulze.  (*Id.* ¶ 16).  As a director, Roussin was considered senior to all three.  (*Id.*).

---

[1] Section 199 refers to a manufacturer's domestic production activity tax deduction.  (Roussin Dep. at 35-36).

From November 2007 until October 2010, Schmeichel served as Roussin's immediate supervisor.  He completed annual assessments of Roussin's performance in which he rated Roussin as "Meets Expectations" and "At Covidien Standards."  Schmeichel's assessments also contained comments that were generally positive as to Roussin's performance.  For example, Schmeichel noted in Roussin's fiscal year 2009 assessment that Roussin possessed "[a] good understanding of deadlines and delivers on time."  (Trombetta Aff. Ex. I, at 5).  For fiscal year 2010, Schmeichel reported that Roussin "continues to be an excellent contributor to the compliance group . . . [and] continues to timely calculate and process all quarterly estimates and tax returns."  (Trombetta Aff. Ex. J, at 6). [2]

### B.    Healy's Direct Supervision of Roussin

In October 2010, Healy replaced Schmeichel and became Roussin's new direct supervisor.  (Healy Aff. ¶ 5).  Roussin reported to Healy until he was terminated in November 2012.  (*Id.*).

The Federal Tax Compliance group assumed more responsibilities at the time Healy became Senior Director.  (Healy Dep. at 51; Roussin Dep. at 50).  One of Carey's concerns was that Deloitte, which provided tax consulting services to Covidien, was too involved in the compliance process and that Covidien should manage or "own" the process.  (Carey Dep. at 64).  During the first year that Healy was the Senior Director, the Federal Tax Compliance group assumed more compliance responsibilities, including some from Deloitte.  (Healy Dep. at 51; Roussin Dep. at 50).  In July 2011, Covidien implemented cost-cutting measures.  (Roussin Dep. at 48).  As a result, the Federal Tax Compliance group had to rely even less on outside

---

[2] Roussin received an annual raise each year he was employed with Covidien, including 2011 and 2012. (LeFleur Aff. ¶ 11).

consultants and take on more responsibilities.  (*Id.*).

C.       **The Research and Development Survey E-Mails**

One of Roussin's responsibilities was coordinating the collection of information

necessary to calculating Covidien's tax credits for research and development.  (Roussin Dep. at

30-35).  Part of Roussin's role was to coordinate between Deloitte, the accounting firm that

actually performed the tax-credit calculations, and Covidien's payroll department, which

provided Deloitte with the payroll data on which the calculations were partly based.  (*Id.* at 30-

35).

On February 2, 2011, Deloitte consultant Kristin Sieminski e-mailed a number of

Covidien employees with a request for information relevant to the R&D credit.  (Rigby Aff.

Ex. I)  The e-mail began with a bolded sentence stating, "The below email is sent on behalf of

Len Roussin, Director of Federal Compliance at Covidien."  (*Id.*).  Although the e-mail

concluded with "Best regards, Len," it was sent by Sieminski with a "cc" to Roussin.  (*Id.*).

On February 14, Sieminski e-mailed a similar survey request to Mike Sgrignari,

Covidien's Senior Vice-President of Global Operations, without including Roussin on the "cc"

line. (Rigby Aff. Ex. J, at 3).[3]  Sgrignari e-mailed Roussin to confirm that the survey was

necessary, stating that "I am not in the habit of taking direction from consultants."  (*Id.* at 1).

When Roussin confirmed that the survey was legitimate, Sgrignari replied that "[w]hoever is

responsible [for the survey] within Covidien Tax should email the recipients, or at [a] minimum,

Deloitte should be copying [the] internal Covidien Tax sponsor."  (*Id.* at 1).  Eventually, Healy

felt the need to "apologize" to Sgrignari for the "miscommunication" concerning the survey.

(Rigby Aff. Ex. K, at 1).

---

[3] The body of the e-mail identified Roussin as the Covidien point of contact for questions concerning the survey.

For fiscal year 2011, the first full year for which Healy supervised Roussin, Healy rated Roussin as "At Covidien Standards." (Rigby Aff. Ex. L, at 9). Healy described Roussin as "a key member [who] can always be counted on to provide his deliverables in a timely fashion." (*Id.* at 6). The assessment did not contain any reference to the Sieminski e-mails in February 2011.

In October 2011, as part of a Section 199 tax project, Roussin was again responsible for sending out an information request to various Covidien employees. Although Roussin sent the request by e-mail from his own account, it was signed by a Deloitte consultant. (Rigby Aff. Ex. M, at 3). Roussin later acknowledged that the e-mail was improper and that he had simply forwarded it on from the consultant. (Roussin Dep. at 126-27). When the e-mails came to Healy's attention, he instructed Roussin to put the project on hold until he and Roussin could discuss it. (Rigby Aff. Ex. M).

### D.   Roussin's Review of Subordinates' Work

In 2012, some of the junior members of the tax compliance group reported to Healy that they had concerns about Roussin's review of their work. For example, Debbie McNamara directly expressed to Healy her opinion that Roussin was not performing an adequate review of her work related to certain pre-acquisition tax returns. (McNamara Dep. at 32). Ericke Schulze also reported to Healy that she did not feel as if she could go to Roussin with questions because his answers were sometimes incorrect or in conflict with what Healy would want done. (Schulze Dep. at 38-39).

### E.   The R&D Credit Issue

At some point in early January 2012, Deloitte gave Roussin an estimated calculation for the fiscal year 2011 R&D tax credit. Roussin noticed that it was significantly lower than the tax

credit amount from previous years.  (*Id.* at 96).  After some investigation, Roussin and Deloitte

discovered that payroll information for approximately 100 employees, which was necessary to

calculate the credit, had not been included in Deloitte's calculations.  (*Id.* at 97).  The

information, however, was deemed "confidential," meaning that Roussin himself was not able to

access it.  (*Id.* at 96).  Roussin coordinated with Covidien's payroll department to provide the

data to Deloitte.  (*Id.*  97-104).  The delay ultimately required the involvement of Healy and

McNamara in the project, which was not completed in April 2012, well past the March 2012

deadline.  (*Id.*  98-99, 112).

### F.    The Airox Extension

Roussin was given the task of preparing a request for an extension for federal tax filing

for Airox, a Covidien subsidiary, which was to be filed on March 15, 2012.  (Roussin Dep. at

70).  On March 16, Healy e-mailed Roussin to ask whether he had filed the extension request.

(*Id.* at 71-72).  Roussin tersely responded in an e-mail, "No, we didn't."  (*Id.* at 72).  Healy

considered that to be an inadequate response and went to Roussin's office, where the two had a

"heated discussion."  (*Id.* at 74).

### G.    Healy's Question to Roussin

Roussin contends that at some point in 2012, Healy asked him, "How long do you intend

to work?"  (*Id.* at 148).  Roussin replied that he intended to work five more years.  (*Id.* at 149).

Roussin testified that he could not remember the date of the conversation; he testified at his

deposition that he "want[ed] to say sometime in . . . early 2012," but "maybe it was later than

that."  (*Id.* at 148).[4]

Roussin also testified that he did not remember the context in which the question was

_____

[4] He further testified that "[m]aybe it was after I went on the [Performance Improvement Plan, which
started on August 27, 2012].  I don't remember exactly."  (*Id.*).

asked. (*Id.* at 149). He does not recall if Healy said anything in response when he said he wanted to work for five more years. (*Id.*). Healy never raised the topic on any other occasion. (*Id.*).[5]

### H.       Fiscal Year 2012 Mid-Year Performance Evaluation

Beginning in fiscal year 2012, Covidien added a mid-year performance evaluation to its existing performance-assessment process. Healy completed Roussin's mid-year evaluation on April 19, 2012. He wrote:

> As a Director [Roussin] needs to lead by example. Len needs to be willing to work on projects/issues that are outside of his comfort zone and be willing to direct others in the effort. He needs to be a resource of help and information for Senior Managers . . . and for other members of the Tax Department.

(LeFleur Aff. ¶ 8; Healy Aff. ¶ 12, Ex. D). Healy also told Roussin that his behavior and response concerning the tax-deadline extension was unacceptable and unprofessional, and that he expected better from a director-level employee. (Healy Aff. ¶ 12).

Around the same time, Healy and Carey began discussing Healy's dissatisfaction with Roussin's performance. Both men expressed concern that Roussin was not showing the leadership or mentoring skills desired of a director. (Healy Dep. at 162-67).

### I.       The United States Surgical Corporation Return

Roussin was also responsible for preparing the fiscal year 2011 tax return for United States Surgical Corporation, a Covidien subsidiary. (Roussin Aff. ¶ 94). Roussin completed most of the return, which was finished by Deloitte while Roussin dealt with an illness. (*Id.*). In May 2012, Healy reviewed the tax forms and Roussin's work papers covering the return and

---

[5] Healy denies that he asked the question. (Healy Aff. ¶20).

found a total of 69 "review points."  (*Id.* ¶ 93).[6]

### J.  The Missed $100 Million Adjustment

In late May 2012, Roussin prepared a third-quarter tax estimate for Tyco Healthcare Group LP, another Covidien subsidiary.  (Roussin Dep. at 131-32).  He failed to include a cost-sharing adjustment that resulted in the calculation being off by more than $100 million.  He did so despite being made aware of the adjustment in advance by Healy.  (*Id.* at 132-33).  According to Roussin, such mistakes were not uncommon; Healy and Medeiros had both previously made a similar error by missing a $78 million goodwill adjustment for a USSC tax estimate.  (Medeiros Aff. ¶ 23; Healy Dep. at 73-74; Roussin Aff. ¶ 64).[7]

### K.  Performance Improvement Plan

After consulting with Covidien's human resources department, Healy placed Roussin on a formal "Performance Improvement Plan," effective August 27, 2012.  (Rigby Aff. Ex. Q).  The PIP called for weekly meetings between the two to discuss Roussin's performance, as well as the generation of weekly progress reports.  (Roussin Dep. at 78-80).

During the first week of the PIP, Roussin was responsible for submitting a draft tax return and a separate R&D tax credit calculation, both of which had a deadline of August 31, 2012.  Roussin, however, missed the deadline for both, completing the draft return on September 4 and the R&D calculation on September 5.  (Roussin Aff. ¶¶ 76-79).

---

[6] The parties disagree as to whether "review points" should properly be characterized as "errors" or as simply issues meriting further discussion before a final decision.  The parties also disagree as to whether the items characterized as "errors" by Healy were made by Roussin or by Deloitte.

[7] Covidien asserts that Healy's oversight of a goodwill adjustment was different than Roussin's oversight because it was a favorable adjustment that Healy had proactively addressed with Carey.  (Healy Sec. Aff. ¶ 19-22).  However, taking the record in the light most favorable to Roussin, there is sufficient evidence to infer that (1) Healy and Medeiros also missed an adjustment on a tax estimate; (2) the adjustment was of a type similar to the adjustment missed by Roussin; and (3) the adjustment was of a roughly similar magnitude.  (Medeiros Aff. ¶ 23; Healy Dep. 73-74; Roussin Aff. ¶ 64).

Healy also continued to take issue with Roussin's review of the senior managers' work. For example, when reviewing a stock-option adjustment made to a fourth-quarter tax estimate, Healy discovered that the adjustment had been miscalculated. (Healy Dep. at 147). Chris Della Valle, a junior member of the group, had originally performed the calculation and submitted it to Roussin for review. (Roussin Aff. ¶¶ 163-65). Della Valle had assured Roussin that the data underlying the calculation was correct. (*Id.*). However, after investigating the error, Healy discovered that it was not. (Second Healy Aff. ¶ 33). Healy personally contacted the Covidien employee responsible for supplying the information at issue and made the necessary changes to the estimate. (*Id.*). Ultimately, the mistake was corrected, but Healy felt that as a director, Roussin should have discovered the error himself instead of relying on Della Valle's assurances. (*Id.* ¶ 33-34).

## L.   <u>Termination</u>

Roussin's performance did not improve, at least in the eyes of Healy. In November 2012, Carey and Healy jointly agreed to terminate Roussin's employment. (Carey Dep. at 84). At the time of the decision, Roussin was 62 years old, Carey was 56, and Healy was 47. (Roussin Dep. at 9; Carey Aff. ¶ 4; Healy Aff. ¶ 21). Covidien did not hire anyone to replace Roussin; instead, the company split his former duties between Lisa Palin, age 45, and Chris Della Valle, age 40. (Healy Dep. at 292).

## M.   <u>The September 2013 Reduction-in-Force</u>

In September 2013, Covidien undertook a reduction-in-force across its federal and state tax compliance groups. (LeFleur Aff. ¶ 13). Carey was primarily responsible for determining which personnel would be let go, although Healy was consulted once Carey had determined that Healy would be retained. (Carey Aff. ¶ 14). At the time the RIF was implemented, the federal

and state tax groups contained 15 employees, 13 of whom were 40 years of age or older. (LeFleur Aff. ¶ 13).  All six of the terminated employees were over 40, leaving the newly reorganized tax compliance group with nine members, seven of whom were older than 40. (*Id.*).[8]

## II.    Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

## III.   The ADEA Claim

---

[8] The six employees whose positions were terminated ranged in age from 41 to 60.  (LeFleur Aff. ¶ 13).

Where no direct evidence of discriminatory animus and causation exists, the reviewing court should evaluate the claim using a three-stage burden-shifting method of proof. *Soto-Feliciano v. Villa Cofresi Hotels, Inc.*, 779 F.3d 19, 22-23 (1st Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). In the first stage, the plaintiff must establish a *prima facie* case by a preponderance of the evidence. *See McDonnell Douglas*, 411 U.S. at 802. That initial showing is "not especially burdensome, and once established, gives rise to a rebuttable presumption that the employer engaged in intentional age-based discrimination." *Melendez v. Autogermana, Inc.*, 622 F.3d 46, 50 (1st Cir. 2010) (quoting *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir. 1995)).

The employer may rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the termination and producing some credible evidence to support that reason. *Melendez*, 622 F.3d at 50; *Gomez-Gonzalez v. Rural Opportunities, Inc.*, 626 F.3d 654, 662 (1st Cir. 2010). If the employer does so, the plaintiff "must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory." *Gomez-Gonzalez*, 626 F.3d at 662 (quoting *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 470 (1st Cir. 2010)).

### A. *Prima Facie* Case

To establish a *prima facie* case for age-based termination under ADEA, a plaintiff must show that (1) he was at least 40 years old at the time he was fired; (2) he was qualified for the position he had held; (3) he was fired; and (4) "the employer subsequently filled the position, demonstrating a continuing need for the plaintiff's services." *Vélez v. Thermo King de P. R., Inc.*, 585 F.3d 441, 447 (1st Cir. 2009).

Roussin was 62 years old when he was terminated.  (Roussin Dep. at 9).  Covidien

divided Roussin's duties between Palin and Della Valle after Roussin left the company.  (Healy

Dep. at 292; LeFleur Aff. ¶ 81).

Covidien contends that Roussin cannot establish the second element of his *prima facie*

case because the performance issues in fiscal year 2012 that led to his termination demonstrate

that he was not qualified for his position.  However, it is well-established that an employer may

not use evidence introduced to support its legitimate, non-discriminatory reason for firing an

employee to defeat the employee's *prima facie* showing that he was qualified for the job.  *Soto-*

*Feliciano*, 779 F.3d at 24.  "To do so would bypass the burden-shifting analysis and deprive the

plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext

designed to mask discrimination."  *Vélez*, 585 F.3d at 448 (quoting *Wexler v. White's Fine*

*Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc)).

Roussin was hired as director in November 2007, and had held that position for

approximately five years at the time he was terminated.  (Roussin Dep. at 15).  The record

contains evidence that Covidien considered Roussin's performance to be at least acceptable

during the first several years of his employment.  (Trombetta Aff. Ex. H-J, FY 2008-11

Performance Assessments).  That evidence is sufficient to meet the "low standard" of showing a

*prima facie* case of discrimination.  *Zapata-Matos v. Reckitt & Coleman, Inc.*, 277 F.3d 40, 44

(1st Cir. 2002); *see also Soto-Feliciano*, 779 F.3d at 24 (finding evidence that employee held

position for "a number of months" sufficient to make *prima facie* showing).

### B.      Employer's Legitimate, Non-Discriminatory Reason

The second step of the *McDonnell Douglas* analysis is relatively easy to resolve.

Covidien has advanced a legitimate, nondiscriminatory reason for Roussin's termination:  that

Carey and Healy made the decision to terminate him as a result of sustained performance issues throughout fiscal year 2012.  More specifically, Covidien contends that Roussin's deficiencies included unsatisfactory preparation of various tax papers; repeated failures to meet assigned deadlines; inadequate review of others' work; mistakes with e-mail requests for information sent to the field; and a general lack of leadership skills expected of a director-level employee.  Thus, Covidien has articulated a "legitimate, nondiscriminatory" reason sufficient to meet its burden of production under *McDonnell Douglas*.

### C.      Evidence of Pretext for Age Discrimination

Roussin contends that Covidien's stated reason for firing him amounts to mere pretext for what he claims is the real reason for his termination, which was age discrimination.  In order to survive summary judgment, the plaintiff must show "some minimally sufficient evidence, direct or indirect, both of pretext and of the employer's discriminatory animus."  *Mesnick*, 950 F.2d at 825.

### 1.      Evidence That Covidien's Stated Reasons Were Pretextual

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Gomez-Gonzalez*, 626 F.3d at 662-63 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).  "When assessing a claim of pretext in an employment discrimination case, a court's focus is necessarily on the motivations and perceptions of the decisionmaker."  *Davila v. Corporacion De Puerto Rico Para La Difusion Publica*, 498 F.3d 9, 16-17 (1st Cir. 2007) (citing *Mesnick*, 950 F.3d at 824).

### a.      Roussin's Performance Reviews

An employee's strong record with an employer as reflected in performance reviews and pay increases may be evidence of pretext when an employer later claims that the employee was fired for poor performance.  *See Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2002).

The parties dispute the proper characterization of Roussin's performance assessments for fiscal years 2008-11, and, consequently, the import of those reviews in determining whether Healy's stated reason for firing Roussin was mere pretext.  Covidien points out that neither Schmeichel nor Healy ever rated Roussin above "At Covidien Standards."[9]  However, writing in the body of the assessment, Schmeichel described Roussin as someone who in fiscal year 2009 had a "good understanding of deadlines and delivers on time," (Trombetta Aff. Ex. I, FY '09 Assessment at 4), and, in fiscal year 2010, as "an excellent contributor to the compliance group," (Trombetta Aff. Ex. J, FY '10 Assessment at 5).[10]  The fiscal year 2011 review, signed by Healy, describes Roussin as "a key contributor" who "works hard and understands the importance of his deliverables."  (Rigby Aff. Ex. L, FY '11 Assessment at 4-5).  Thus, there is evidence that Roussin's performance reviews during fiscal years 2008-11 were generally positive.

There is no dispute that Roussin's performance evaluations began to turn worse no later than his fiscal year 2012 mid-year evaluation, culminating in the performance improvement plan and the fiscal year 2012 full-year performance assessment.  Covidien contends that the evaluations should be taken at face value, and that the downturn simply reflected the fact that Roussin's performance either deteriorated or, alternatively, failed to meet the higher standards of

---

[9] The record does not indicate where on the spectrum that rating falls as a matter of practice at Covidien.  In many organizations a rating of "satisfactory" or "meets standards" is in fact a mediocre or poor review, but there is no evidence here as to the true meaning of those ratings at Covidien.

[10] Similar comments are sprinkled throughout all three reviews signed by Schmeichel.

a new supervisor operating in a stricter environment.  In Covidien's view, as Roussin continued to fall short of Healy's expectations, Healy began to more frequently document Roussin's shortcomings.  Roussin, however, contends that his performance remained acceptable and that he continued to meet all the requirements of his position as a director.  In Roussin's view, the negative reviews—when juxtaposed with years of positive assessments—demonstrate pretext; specifically, that Healy intentionally began to overstate minor performance issues in order to hide the real reason he wanted Roussin terminated.

In any event, viewing the evidence in the light most favorable to the plaintiff, Roussin had positive performance reviews in 2008-2011 before he received a negative review in 2012, and that fact is some evidence of pretext.

### b.        The Missed $100 Million Adjustment

As further proof of Roussin's alleged poor performance, Covidien points to Roussin's omission of a cost-sharing activity that resulted in a miscalculation of more than $100 million in the fiscal year 2012 third-quarter estimate for Tyco.  Roussin concedes that he failed to include the cost-sharing item, but argues that Covidien's emphasis on the omission is inconsistent given that Healy himself missed a $78 million adjustment on the very same return in a previous quarter.  (Medeiros Aff. ¶ 23).  Roussin contends that such inconsistency is evidence that Healy's stated reason for firing him was pretextual.

Roussin's line of reasoning, however, overlooks a critical difference between Healy's mistake and his own; namely, that Healy specifically told Roussin about the adjustment in advance, and to make sure it was included.  As Covidien notes, Healy's frustration was not based just on the mistake itself, but on the fact that Roussin had made the mistake despite Healy's prior warning.

In assessing pretext, courts and juries must focus on "'the perception of the decisionmaker,' that is, whether the employer believed its stated reason to be credible." *Mesnick*, 950 F.2d at 824.  Roussin does not dispute that Healy gave him notice as to the adjustment.  Furthermore, Roussin does not point to any other evidence in the record suggesting that Healy's reaction was either inconsistent or implausible under the circumstances.

c.      **The United States Surgical Corporation Return**

Covidien also relies on Healy's displeasure with Roussin's work on the fiscal year 2011 tax return for United States Surgical Corporation.  Roussin does not dispute that he completed the "majority" of the USSC return, or that Healy had in excess of 50 "review points."  The parties do dispute, however, just how many of the review points are properly characterized as "errors," and, to the extent that any errors were found, whether Roussin or Deloitte were responsible.

During his deposition, Healy specifically identified 18 review points as errors.  (Healy Dep. at 226-41).  Roussin has not pointed to any specific evidence suggesting that Healy's characterization was mistaken, nor has he attempted to identify any of the errors he alleges were made by Deloitte.  Thus, the record evidence indicates that at least some of the review points were related to actual errors found in the return, and that those errors were attributable to Roussin.

Roussin, however, contends that the USSC return, and Healy's reaction to it, demonstrates pretext because Healy had similar numbers of review points for other group members, who did not receive negative evaluations or other discipline.  Specifically, Roussin asserts that the work of Diane Medeiros on the tax return for Covidien LP resulted in 50-plus review points, and that Medeiros was not terminated.

"A claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in material respects." *Walker v. City of Holyoke*, 523 F. Supp. 2d 86, 103 (D. Mass. 2007) (quoting *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996)). "The test is whether a 'prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" *Perkins*, 78 F.3d at 751 (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)).

Roussin contends that Medeiros is a useful analogue because both he and Medeiros had equivalent levels of responsibility, if not equivalent job titles. Roussin further points out that it would be impossible for him to demonstrate unequal treatment if job titles were dispositive, because he was the only director-level employee in the federal tax compliance group.

Covidien contends that Medeiros does not make for a "roughly equivalent" comparison for two reasons. First, as a senior manager, less was expected of Medeiros than of Roussin, who was a director. Second, Covidien contends that the Covidien LP return, completed by Medeiros, was more complicated than the USSC return.

Even assuming that Roussin and Medeiros had roughly equivalent levels of responsibility, the fact remains that Roussin was a director and Medeiros was a senior manager. Put another way, if Roussin's characterization of Medeiros's performance—equal responsibility performed with equal skill—is correct, it necessarily means that Roussin's work was equivalent to that of a senior manager. And there is nothing in the record to support a conclusion that Healy's response to a director producing work at the same level as a senior manager was mere pretext.

> **d.**     <u>**Failure to Meet Deadlines**</u>

Covidien further notes that Roussin missed important deadlines on at least three occasions:  the Airox extension; a draft return due on August 31, 2012; and an R&D calculation also due on August 31.  In the case of the Airox extension, Covidien further contends that Roussin reacted poorly when Healy pressed him for an explanation.

Roussin explains that he missed the Airox deadline only because he was in the middle of completing the USSC return.  He further characterizes the Airox extension as immaterial because missing it did not impose any tax liability or other harm on Covidien.  Roussin takes a similar position with respect to the delays in sending the draft return, submitted on September 4, 2012, and the R&D calculation, completed on September 5th, arguing that both were immaterial because the delay period spanned the Labor Day holiday weekend.[11]

When a plaintiff seeks to establish that a given reason for firing was a pretext, the question is not whether a supervisor's negative impression is accurate or warranted.  Instead, in order to show pretext, the plaintiff must put forth evidence demonstrating that the employer's stated belief was unreasonable or implausible.  *See Gomez-Gonzalez*, 626 F.3d at 662-63; *Sullivan v. Liberty Mut. Ins.*, 444 Mass. 34, 56-57 (2005).

While Roussin may debate the importance of filing the Airox extension on time, he admits that he was responsible for meeting the deadline and failed to do so.  Roussin further admits that when Healy asked if the extension had been completed, Roussin gave a terse response—"no, we didn't"—that Healy found inadequate.  (Roussin Dep. at 72-74).  Other than attempting to minimize the importance of the missed deadlines, Roussin offers no evidence to support his contention that Healy was unreasonably upset by Roussin's tardiness.

---

[11]  Roussin asserts in his affidavit that "others in the federal tax compliance group submitted work beyond deadlines on a regular basis."  (Roussin Aff. ¶80).  He does not, however, point to any specific instances in the record to support that claim.  *See Soto-Feliciano*, 779 F.3d at 25 ("A plaintiff must elucidate specific facts which would enable a jury to find that the reason given" is a pretext.) (internal quotations omitted).

### e.     **Inadequate Review of Junior Tax Compliance Members**

Roussin next takes issue with Covidien's contention that Healy no longer trusted Roussin to perform an adequate review of the work done by the junior members of the tax compliance group.

### i.     **Co-Worker Complaints to Healy**

Roussin does not contest the fact that Deborah McNamara and Ericke Schulze complained to Healy about the quality of review Roussin provided on their projects.  Roussin instead contends that there is a genuine issue as to the legitimacy of those complaints.  His position appears to be that even though the two complained about his review of their work, those complaints were not justified because (1) Roussin's review was adequate, regardless of what McNamara and Schulze thought, and (2) McNamara and Schulze did not have sufficient personal knowledge to make credible complaints.

Roussin's first argument is easily dismissed.  In assessing pretext, courts and juries must focus on "'the perception of the decisionmaker,' that is, whether the employer believed its stated reason to be credible."  *Mesnick*, 950 F.2d at 824.  Thus, the question is not whether the complaints made against Roussin were accurate.  Rather, the question is whether Healy knew or believed the complaints were false, and what effect those complaints had on the decision to terminate Roussin's employment.  And there is no evidence that Healy knew or even should have suspected that the claims were false.

Roussin's second argument is not supported by the record.  In her deposition, McNamara testified that after Roussin reviewed her work, it would go to Healy, who would return the work with review points that she believed Roussin should have found.  (McNamara Dep. at 32).  Thus, McNamara performed the initial work, was privy to Roussin's review, and then also received

Healy's review.  Whether or not she was correct, she certainly had the personal knowledge necessary to communicate a legitimate opinion to Healy.

### ii.    The Fourth-Quarter Stock-Option Adjustment

Covidien also cites Roussin's role in the stock-option adjustment missed by both Della Valle and Roussin after implementation of the PIP.  Roussin points to Della Valle as the real source of the problem, and contends that Roussin acted appropriately because Della Valle "assured" him that the calculations were correct.  (Roussin Aff. ¶ 163-65).

But as with the complaints by McNamara and Medeiros, the focus should not be on Roussin's evaluation of his own performance, but on Healy's assessment, whether fair or unfair. In his deposition, Healy testified to his opinion that Roussin should have been catching errors in Della Valle's calculations, and not simply relying on Della Valle's assurance that those calculations were correct.  Thus, Healy's frustration was not simply based on the fact that an error was made; rather, Healy was unhappy that he, and not Roussin, was the person who detected the error, and that he, and not Roussin, was the one who had to correct it.  (Second Healy Aff. ¶ 33-34).

Again, in assessing pretext, courts and juries must focus not on the accuracy of the employer's stated reason, but on "whether the employer believed its stated reason to be credible."  *Mesnick*, 950 F.2d at 824.  While Roussin may dispute whether he did or did not perform an adequate review of the others' work, he again has not put forth any evidence to demonstrate that Healy's reliance on that conclusion was a mere pretext.

### f.    E-Mail Requests to the Field

Next, Covidien states that Roussin was fired in part because he made repeated mistakes in sending out information requests over e-mail, demonstrating a "lack of ownership" over the

tax preparation process.  As examples, Covidien highlights the February 2, 2011 e-mail sent by

Deloitte's Kristin Sieminski on Roussin's "behalf," as well as the February 14, 2011 survey

request e-mailed to Sgrignari.  Covidien also refers to the October 2011 e-mail written by a

Deloitte consultant that Roussin admits he forwarded.

Roussin does not dispute that he undertook those actions, and did not comply with his

supervisor's wishes.  Nor does he dispute that Healy became involved with respect to Sgrignari

and the forwarded e-mail written by Deloitte.   Instead, Roussin argues that the fact that Covidien

ultimately did not suffer any harm implies that Healy's focus on Roussin's e-mail mistakes is

suspicious and thus likely pretextual.  Roussin also contends that the absence of any mention of

the February 2011 e-mails in the fiscal year 2011 performance assessment indicates that Healy

did not truly believe that they were a problem.  However, this argument is undercut by the fact

that Healy's displeasure was documented in real time by his e-mail apology to Sgrignari.  (Rigby

Aff. Ex. K, at 1).  And there is no other evidence suggesting that Healy did not truly believe

Roussin's e-mail problems were a problem.

### g.      Roussin's Alleged Lack of Leadership Skills

Finally, Covidien states that Roussin was fired in part because he failed to exhibit the

leadership skills expected of a director-level employee.  Healy contends that he never felt

comfortable allowing Roussin to be a final reviewer, because he regularly found errors in

Roussin's work.  (Healy Dep. At 266-67).  Covidien also points to Healy's belief that Roussin

should have been more proactive in handling the collection of the confidential payroll data

necessary to Deloitte's calculation of Covidien's research and development tax credit in early

2012.  Roussin acknowledges that he became aware of the problem in mid-January and that the

tax-credit calculations were not finished until April.  Roussin contends, however, that the late

collection of the data was not his fault, noting that he was not allowed access to the underlying information because it was confidential, and that he worked diligently to rectify the situation once it came to his attention.

While Roussin takes issue with Healy's evaluation, he does not put forth evidence that Healy's stated reason was so implausible, inconsistent, or contradictory that a reasonable jury could find that it was pretextual.  For example, Roussin testified at his deposition that he "worked back and forth with [Deloitte] on a[n] . . . almost daily basis" to get the information necessary to resolving the issue.  (Roussin Dep. at 108).  He does not, however, point to evidence in the record indicating that Healy was aware of Roussin's efforts to fix the problem.  Nor does Roussin supply any evidence demonstrating that Healy's stated assessment that Roussin was not proactive was somehow implausible given that, as Roussin acknowledges, it took three months to correct the issue and the final calculations were not completed until a month after the deadline.

### 2.      Evidence of Animus

Evidence of pretext is only "half of the battle."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990).  In order to survive summary judgment, a plaintiff must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive:  age discrimination."  *Soto-Feliciano*, 779 F.3d at 25 (quoting *Mesnick*, 950 F.2d at 824); *Medina-Munoz*, 896 F.2d at 9 (the plaintiff must show "colorable evidence to show that the reasons, if pretextual, were pretexts *for age discrimination*") (emphasis in original); *see also Velez*, 585 F.3d at 452 (rational jury must be able to conclude that unlawful age discrimination was the "actual, but-for cause" of the discrimination).

Thus, the final step in the analysis requires an examination of the record for evidence of

animus based on age—that is, evidence that Roussin was fired, in whole or in part, because of his age.   In considering whether a plaintiff has put forth sufficient evidence of discriminatory animus, the Court must "look to the evidence as a whole."   *Cuello-Suarez v. Puerto Rico Elec. Power Auth. (PREPA)*, 988 F.2d 275, 280 (1st Cir. 1993).   In substance, Roussin points to three items of evidence:  (1) the fact that he was replaced by two younger workers; (2) the September 2013 reduction-in-force, in which some older workers were laid off; and (3) the question posed to him by Healy in 2012.

### a.        Roussin's Duties Assigned to Palin and Della Valle

When Roussin was fired, at age 62, Covidien did not hire a replacement.   Instead, his duties were split between Palin, age 45, and Della Valle, age 40.   Although both Palin and Della Valle are members of the same protected group as Roussin, age discrimination may exist even where the fired employee's replacements are themselves more than 40 years of age.   *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 309-13 (1996); *see also Knight v. Avon Prods., Inc.*, 438 Mass. 413, 425 (2003) (age discrimination may be shown by an age difference of as little as five years).

Evidence that an older employee was replaced by one or more younger employees is part of a *prima facie* case of discrimination.   And that evidence can, of course, be probative of age-based animus.   But such evidence is not necessarily strong evidence of animus.   Here, it is undisputed that Covidien did not hire anyone to replace Roussin (indeed, it downsized the group within the following year), but transferred his functions to others (both of whom were in their 40s).   While that may be considered evidence of age-based animus, it is also entirely consistent with the evidence that Covidien was unhappy with Roussin's performance and was seeking to reduce the size of the tax compliance groups.

### b.      The September 2013 Reduction-in-Force

Roussin also seems to suggest that a general culture of age discrimination existed within Covidien—or at least its tax compliance groups under Carey and Healy— by pointing to the results of Covidien's 2013 reduction-in-force.

Of course, a court may not look at plaintiff's evidence of discrimination in "splendid isolation." *Mesnick*, 950 F.2d at 824.  However, general allegations of a discriminatory culture have less probative weight when, as here, plaintiff is alleging disparate treatment. *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993) (citing *Cumpiano v. Banco Santdander P.R.*, 902 F.2d 148, 156 (1st Cir. 1990)).[12]  This is because "[i]n a disparate treatment case . . . the issue is less whether a pattern of discrimination existed and more how a particular individual was treated, and why." *Cumpiano*, 902 F.2d at 156. This does not mean, however, that such evidence is irrelevant to the existence of pretext or animus.  *See Mesnick*, 950 F.2d at 824 (stating that "statistical evidence showing disparate treatment by the employer to members of the protected class" is relevant to pretext).  However, it must be evaluated in light of plaintiff's "aggregate package of proof" to determine whether the decisionmaker "believed its stated reason to be credible." *Id.*

Before the reduction-in-force, the federal and state tax compliance groups contained 15 employees, 13 of whom were 40 years of age or older.  (LeFleur Aff. ¶ 13).  All six employees terminated during the RIF were over 40, leaving the new tax compliance group with nine members, seven of whom were older than 40.  (*Id.*).  The six employees whose positions were

---

[12] "A 'disparate treatment' cause of action accrues 'when an employer treats an employee less favorably than others because of her race, color, religion, sex, [ ] national origin,' or age." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993) (quoting *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 156 (1st Cir.1990)).

terminated ranged in age from 41 to 60.  (*Id.*).

In *Sullivan v. Liberty Mut. Ins. Co.*, the plaintiff offered evidence that five of six employees let go following a reduction-in-force were over the age of 40 and that the average age of the remaining employees decreased.  444 Mass. at 49.  The Supreme Judicial Court, however, found the statistical evidence to be of "limited probative value" in demonstrating discrimination because the evidence failed to eliminate other explanations for the seemingly-disproportionate statistics, such as random chance, or account for the actual distribution of skills sets and expertise among employees of different ages before and after the reduction-in-force.  *Id.* at 55.

Roussin's statistical evidence here is similar in nature.  Without identifying any specific evidence in the record, Roussin appears to argue that the RIF is evidence of disparate treatment because only older employees were terminated during the reduction, while the younger employees were reassigned.  But he does not offer any evidence in rebuttal to Covidien's asserted legitimate business reasons for its decisions, which are supported by record evidence.  Nor has Roussin attempted to account for chance or other non-discriminatory explanations behind the numbers, such as the respective abilities of the employees.  Finally, the reduction-in-force occurred nearly a year after Roussin left the company, which also diminishes the force of the argument.

### c.      Healy's Question to Roussin

Finally, Roussin also points to a conversation he had with Healy in which Healy asked him "how much longer [he] intended to work."  (Roussin Dep. at 148).  It is of course true that discrimination may be proved through discriminatory statements made to the plaintiff.  *See Dominguez-Cruz*, 202 F.3d at 433-34 (1st Cir. 2000).  However, Healy's alleged question is a near-classic example of a stray remark.  *See, e.g., Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8,

13 (1st Cir. 1998) (supervisor asked plaintiff "how old he was and when he planned to retire";

court found that "this is . . . a textbook example of an isolated remark which demonstrates

nothing"); *Wallace v. O.C. Tanner Recognition Co.*, 299 F.3d 96, 100 (1st Cir. 2002)

(supervisors asked plaintiff multiple times about his retirement plans and when he planned to

retire; court found that "[n]one of the inquiries [] had significant probative value" and were

"brief, stray remarks unrelated to the termination decisional process . . . company officials are

permitted to gather information relevant to personnel planning without raising the specter of age

discrimination.").

Roussin contends that this particular question is at least supportive of an inference of age

animus, citing to *Soto-Feliciano*, 779 F.3d at 25-26.  There, however, the comments attributed to

the plaintiff's supervisors were much more extreme.  For example, the plaintiff's supervisor

purportedly told him, "[Y]ou are old to work. . .," and "you need some long vacations because

you are old and slow."  *Id.*  Cases abound with similar comments.  *See, e.g.*, *Hodgens v. General

Dynamics Corp.*, 144 F.3d 151, 171 (1st Cir. 1998) (listing examples).

Furthermore, Roussin cannot identify the time or date of the conversation, cannot tie it

directly to any specific incident in his employment, and indeed cannot provide any information

about the context in which the question was asked.  At the very least, the lack of any context

substantially diminishes whatever weight the statement might have.

In short, the question is isolated and ambiguous, and adds little to the mix of information

supporting a finding of age-based animus.

### 3. <u>The Evidence as a Whole</u>

"In evaluating [plaintiff's] contention at the summary judgment stage, the critical

question is 'whether or not the plaintiff has adduced minimally sufficient evidence to permit a

reasonable factfinder to conclude that he was fired because of his age.'" *Soto-Feliciano*, 779 F.3d at 25 (quoting *Vélez*, 585 F.3d at 452).

As a general matter, it is perfectly legal to fire a 62-year-old employee. It is also perfectly legal to fire a poor or mediocre employee. Indeed, if the employee is an at-will employee, the employer can fire him for any reason—fair or unfair, right or wrong, rational or irrational—as long as the decision is not based, even in part, on a discriminatory motive. It is not the role of the federal courts to supervise or second-guess the business decisions of corporate managers. *See Melendez*, 622 F.3d at 53 (citing *Mesnick*, 950 F.2d at 825). The Court's focus, therefore, is not on whether Roussin was treated fairly, but whether there is sufficient evidence that the decision-makers—in this case, Healy and Carey—acted with discriminatory animus. *See Melendez*, 622 F.3d at 53-54.

Taking the evidence in the light most favorable to Roussin, his case can be summarized as follows: After several years of receiving positive performance reviews, Roussin's new supervisor, Healy, began raising performance issues with him. Roussin disagrees with Healy's assessments, and contends as a general matter that they are exaggerated. At some point, in an unknown context, Healy asked Roussin how long he expected to work. Within a year, Healy had put Roussin on a performance improvement plan; he soon fired him and assigned his functions to two employees in their 40s. One of those employees was known to Healy to be responsible for a calculation error that Healy specifically blamed Roussin for not catching. Ten months after Roussin left, Covidien downsized its tax compliance groups from 15 employees to nine; all six of the terminated employees were over 40, as were seven of the nine who remained. Other than this, Roussin testified repeatedly in his deposition and by affidavit as to his own perception of his work performance, but presented very little evidence (beyond his own subjective perception and

speculation) that Healy's claimed perception was pretextual or that Healy and Carey were motivated by discriminatory animus.

In response, Covidien has presented substantial uncontested evidence that it had multiple, valid nondiscriminatory reasons for firing Roussin.  The record includes uncontested evidence that Roussin failed to meet at least three deadlines; failed to include an adjustment even when specifically forewarned; was insufficiently responsive when asked by Healy why a deadline was missed; had repeated issues following Covidien policy concerning e-mailing of information requests; was the subject of complaints to Healy regarding his review of the work of others; and, finally, in Healy's view, was not proactive enough in resolving issues.

In addition, although not dispositive, any inference of age discrimination is further weakened by the fact that Roussin was within the protected class under the ADEA when he was hired, and by the fact that the managers who made the firing decision were themselves members of the same protected class.  *See LeBlanc*, 6 F.3d at 847; *Richter v. Hook-SuperRx*, 142 F.3d 1024, 1032 (7th Cir. 1998); *Mathews v. Atria Huntington*, 499 F. Supp. 2d 258, 267 (E.D.N.Y. 2007).

In summary, the evidence of pretext is wafer-thin, and the evidence of age-based animus is nearly non-existent.  "An employer [is] entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employee's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000).  At most, Roussin has created only a weak issue of fact as to pretext, and an even weaker issue as to age animus.

Considering "plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and other evidence supporting the employer's case," Covidien is

29

entitled to summary judgment on Roussin's ADEA claim.  *Zapata-Matos*, 277 F.3d at 47-48.

**V.      Claim under Mass. Gen. Laws ch. 151B**

Massachusetts courts construe state age discrimination law the same as federal age discrimination law in most respects.  *See Sullivan*, 444 Mass. at 40 n.11.  The Court analyzes the state age discrimination claim separately only to highlight one potential difference.

The analysis of age discrimination claims under Massachusetts law is "in one relevant respect perhaps . . . friendlier to plaintiffs."  *Joyal v. Hasbro, Inc.*, 380 F.3d 14, 17 (1st Cir. 2004).  In 2001, the Supreme Judicial Court held in *Lipchitz v. Raytheon* that a plaintiff "may be able—automatically and regardless of circumstances—to avoid a directed verdict and reach a jury if he or she proves that at least one of the reasons given by the defendant was pretextual."  *Joyal*, 380 F.3d at 17.  In other words, *Lipchitz* could be construed to support the proposition that a plaintiff who meets the prima facie case and also sets forth sufficient evidence from which the jury could conclude that at least one of the defendant's reasons was false is entitled as a matter of law to a jury trial.  *Id.*

The First Circuit has noted that such a rule would be "oddly mechanical," and may lead to counterintuitive results when taken to its extreme.  *Id.* (assuming, without deciding, that under Massachusetts law, "any deliberately false reason would get [a plaintiff] to a jury").  Even under a more generous rule, the focus under state law is still on the truth or falsity of the reason for the termination.  "'[I]f the reason given by the employer is the real reason for its action,' it does not matter if 'the employer's action was arbitrary or unwise.'"  *Id.* at 19 (quoting *Wheelock Coll. v. MCAD*, 371 Mass. 130, 138-39 (1976)).

The overwhelming weight of the record evidence indicates that Covidien's stated reason for firing Roussin was, in fact, the actual reason behind his firing.  Accordingly, Covidien is also

entitled to summary judgment on Roussin's claim under Mass. Gen. Laws ch. 151B.

**VI.**     **<u>Conclusion</u>**

For the reasons set forth above, defendant's motion for summary judgment is

GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor_____

F. Dennis Saylor IV

Dated: February 1, 2016                    United States District Judge